IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
*Southern Division*

BRYAN T. SMITH,

    Plaintiff,

v.      Case No.: 8:17-cv-03122-PWG

MONTGOMERY COUNTY, MARYLAND,

    Defendants.

## MEMORANDUM OPINION

Plaintiff Bryan Smith brought this employment-discrimination suit in October 2017 against Montgomery County, alleging his supervisors in the Department of Transportation failed to make reasonable accommodations for his cognitive impairments. The County asserts that Mr. Smith, while represented by counsel, accepted the terms of a settlement agreement in spring 2018 but never signed the written agreement. The County here seeks an order enforcing the agreement.

The record supports the County's assertion that Mr. Smith knowingly and voluntarily assented to the agreement. Accordingly, I am granting the County's motion for enforcement. A separate motion to seal various filings in this case will be granted in part and denied in part.

## FACTUAL BACKGROUND

Mr. Smith is an equipment operator for the Montgomery County Department of Transportation ("DOT"). Am. Compl. ¶¶ 1, 29, ECF No. 11. He alleges that, since at least 1993,

he has suffered from a variety of cognitive disorders that impair his ability to think and concentrate and that cause him "to be easily frustrated and overwhelmed."[1] *Id.* ¶¶ 4, 7.

In October 2017, Mr. Smith filed a *pro se* complaint against the County,[2] alleging that his supervisors in the Department had not granted any of the requests he had made for "reasonable accommodations" over the previous two years. Compl., ECF No. 1. Specifically, he alleged they had either denied or failed to respond to his various requests for permission to "take breaks to avoid drift," break larger projects into smaller projects, use a recording device to record meetings and work-related conversations, perform no more than a single task at once, receive additional time to complete tasks, receive written instructions, and enjoy a "modified work day." *Id.* ¶ 7, 12. His suit sought to hold the County liable for violations of the Americans with Disabilities Act of 1990 ("ADA") and the Maryland Fair Employment Practices Act ("MFEPA"). *Id.* ¶¶ 17, 33.

After failing to participate in a pre-motion telephone conference call this Court had scheduled to discuss the status of the case, Mr. Smith retained counsel and filed an amended complaint, asserting the same ADA and MFEPA claim as before. *See* ECF Nos. 10, 11. In a March 2018 telephone conference call, I authorized Mr. Smith's attorney, A. Marques Pitre, to file a second amended complaint and I set a briefing schedule for the County's proposed motion to dismiss the case. *See* ECF No. 16.

None of those filings ever materialized. What happened, rather, was that on April 12, 2018, the parties notified me they were engaged in talks to settle the case. *See* ECF No. 17. To allow

---

[1] The Amended Complaint says he has been diagnosed with "cognitive disorder, learning disorder, major depressive disorder, and adjustment disorder with anxiety." Am. Compl. ¶ 4.
[2] Mr. Smith also sued the Department of Transportation. He later voluntarily dismissed the Department as a defendant. Am. Compl. 1 n.1.

those talks to proceed, I agreed to give Mr. Smith additional time to further amend his complaint, extending the deadline to May 7, 2018. *See* ECF No. 18.

That deadline came and went. The next I heard from the parties was on June 11, 2018, when the County notified me via letter that it was planning to file a motion to enforce a settlement agreement it said the parties had reached. *See* ECF No. 19. The letter asserted that counsel for both parties had "reached a complete settlement on April 24, 2018," and that Mr. Smith had approved its terms. *Id.* Mr. Smith, though, had not signed the agreement, and while he had not "explicitly" refused to do so, his attorney, Mr. Pitre, was finding him uncommunicative. *See id.* Mr. Pitre soon withdrew from the case, explaining the attorney-client relationship between himself and Mr. Smith was "irretrievably broken." ECF No. 20.

The County on July 2, 2018, filed a motion to enforce the settlement agreement or, alternatively, to dismiss the Amended Complaint.[3] ECF No. 25. In support of its request to enforce the agreement, the County enclosed copies of emails the parties' counsel had exchanged between April 2018 and June 2018. *See* Settlement Negotiation Emails, ECF No. 25-4; Signature Emails, ECF No. 25-12.

The emails show that in April 2018, the attorneys for both parties were working to hash out a deal that would include both a monetary offer as well as a promise to make certain accommodations in Mr. Smith's workplace. *See* Settlement Negotiation Emails. On April 23, 2018, Associate County Attorney Justin Nunley wrote to Mr. Pitre:

> [T]he County is willing to offer $5000 as full settlement of all of Mr. Smith's claims (including attorneys' fees) for disability discrimination under state and/or federal law up to the present date. The County takes no position as to what percentage of the $5000

---

[3] The County's primary argument for dismissing the case is that Mr. Smith failed to properly exhaust his administrative remedies before filing suit.

> will be applied to attorneys' fees and what percentage Mr. Smith will retain. That decision is entirely between you and Mr. Smith.
> Please convey this monetary offer to Mr. Smith. I also look forward to your update regarding Mr. Smith's training requests so that I can keep working on those. I will continue to work with you, DOT, OHR, and Mr. Smith to get those requests ironed out. I view the accommodation requests as separate from the monetary component of any settlement....

*Id.* at 8-9.

Mr. Pitre wrote back the next morning (April 24, 2018): "Thank you for the monetary offer below[.] I have communicated this offer to my client, and he will accept the terms." *Id.* at 7. The email proceeded to clarify that Mr. Smith wished to do more at work than merely "drive the trucks," and that he would like additional training to enable him to operate other types of equipment. *See id.* "I believe that would cover all of our Reasonable Accommodation concerns, so when you're ready to present a draft settlement agreement covering all that we have discussed, I would be happy to review and present to my client for signature," Mr. Pitre wrote. *Id.* at 8.

Mr. Nunley responded on April 27, 2018, saying DOT had confirmed it could provide the requested training. *See id.* at 5. An April 30, 2018 email from Mr. Pitre replied: "That is wonderful news! Looks like we'll have this wrapped up shortly." *Id.* at 4.

Mr. Nunley emailed a "draft accommodation letter" to Mr. Pitre the next day, asking him to "[p]lease review [it] to make sure it accurately reflects our discussions, and let me know if you approve." *Id.* at 1; *see* Accommodation Letter, ECF No. 25-5. He soon afterward drafted a release, which he sent to Mr. Pitre for approval on May 9, 2018. *See* Release Emails 2, ECF No. 25-6. Mr. Pitre returned it less than an hour later with "some minor changes." *Id.* at 1. Mr. Nunley, after accepting all of the edits and declaring the release "finalized," *id.*, sent a "final" version of both the release and accommodation letter to Mr. Pitre, asking him to provide them to Mr. Smith for his signature and notarization, ECF No. 25-8.

4

Weeks passed. On May 30, 2018, Mr. Nunley pressed Mr. Pitre to "please let me know when you expect Mr. Smith will sign the Release so that I can get the check out." Signature Emails 6. "My understanding," Mr. Nunley wrote later that day in a follow-up email, "is that we had reached an agreement and were just waiting on Mr. Smith's signature for the Release." *Id.* at 4. Mr. Pitre replied: "We indeed reached an agreement, however, I have been unable to get my client to sign the Release." *Id.* Two days later, on June 1, 2018, Mr. Pitre wrote: "I got a call from Mr. Smith saying that he would send the document today. If not, I'll be withdrawing from the case in the morning." *Id.* at 2. After further correspondence between the two attorneys, Mr. Pitre confirmed on June 7, 2018: "We will be withdrawing from Mr. Smith's case within the next couple of days. . . . I'm really sorry we couldn't get this worked out. I will support any of your efforts to have the Judge enforce the Settlement Agreement, as Mr. Smith did agree to the terms." *Id.* at 1.

The County's motion has been fully (and, for that matter, extensively) briefed.[4] *See* ECF Nos. 25, 29, 35, 37-38, 41, 47, 50. On January 17, 2019, I ordered the parties to submit supplemental briefing on the question of "whether Mr. Smith's purported assent to the settlement agreement was knowing and voluntary." ECF No. 46. The parties have submitted the requested supplemental briefing. *See* ECF Nos. 47, 50. The County's brief, I note, includes an affidavit from Mr. Smith's former counsel, Mr. Pitre. *See* Pitre Aff., ECF No. 47-1. In it, Mr. Pitre avers that he had discussed the agreement with Mr. Smith during the course of the negotiations and that, "[o]nce all the terms were agreed to, Mr. Smith indicated he would sign the settlement agreement once the County sent it to us." *Id.* ¶ 8.

---

[4] Mr. Smith's response in opposition to the motion was initially due July 16, 2018. *See* ECF No. 28. I twice granted Mr. Smith an extension of time, *see* ECF Nos. 28, 34, but of the various documents he filed over the ensuing months, none could be said to clearly respond to the motion, *see* ECF Nos. 29, 35, 37, 38. On October 11, 2018, I notified the parties that I would construe those filings, collectively, as his response in opposition to the motion. *See* ECF No. 40.

## DISCUSSION

The County has filed two motions that require my attention. First and foremost is the Motion to Enforce Settlement Agreement or, in the Alternative, Motion to Dismiss Plaintiff's Amended Complaint. ECF No. 25. The second is a Motion to Seal Certain Documents and Pleadings. ECF No. 27. I will address each motion in turn.

### Motion to Enforce Settlement Agreement

The County's first motion urges me to enforce the parties' unsigned settlement agreement. Its backup argument, should I reject the first, is that I should dismiss the Amended Complaint for a multitude of reasons, including that the charge of discrimination he filed with state and federal authorities was untimely and unverified and lacked essential details. Because I am granting the motion to enforce the settlement agreement, there is no need to reach the arguments addressing the merits of Mr. Smith's Amended Complaint.

A district court has "inherent authority, deriving from [its] equity power, to enforce settlement agreements." *Hensley v. Alcon Labs, Inc.*, 277 F.3d 535, 540 (4th Cir. 2002) (explaining that "resolution of a motion to enforce a settlement agreement . . . may be accomplished within the context of the underlying litigation without the need for a new complaint"). "When asked to enforce a settlement agreement, a court must first 'ascertain whether the parties have in fact agreed to settle' and then 'discern the terms of that settlement.'"[5] *Power Servs., Inc. v. MCI Constructors,*

---

[5] The Fourth Circuit has outlined a district court's obligations when reviewing a motion to enforce a settlement agreement:

> [I]f there is a substantial factual dispute over either the agreement's existence or its terms, then the district court must hold an evidentiary hearing. If, however, a settlement agreement exists and its terms and conditions can be determined, as long as the excuse for nonperformance is comparatively unsubstantial, the court may enforce the agreement summarily.

*Inc.*, 36 F. App'x 123, 125 (4th Cir. 2002) (per curiam) (quoting *Moore v. Beaufort Cty.*, 936 F.2d 159, 162 (4th Cir. 1991)).

The question of whether to enforce a settlement agreement is governed by "standard contract principles." *Topiwala v. Wessell*, 509 F. App'x 184, 186 (4th Cir. 2013) (per curiam); *see Hayward v. Brown*, No. PWG-15-3381, 2017 WL 2117364, at *2 (D. Md. May 16, 2017), *aff'd*, 696 F. App'x 102 (4th Cir. 2017) (per curiam). Ordinarily, as a matter of Maryland contract law, a party seeking to enforce a settlement agreement "must show (1) offer and acceptance, (2) consideration, and (3) an agreement containing definite and material terms." *Rohn Prods., Int'l v. Sofitel Capital Corp. USA*, No. WDQ-06-0504, 2010 WL 681304, at *3 (D. Md. Feb. 22, 2010) (citing *Cochran v. Norkunas*, 919 A.2d 700, 708 (Md. 2007)).

1.

I start with a threshold question: whether Mr. Smith had the capacity to enter into an agreement. Naturally, for a contract to be valid, the parties to it must have the capacity to consent. *See Potter v. Musick*, 230 A.2d 91, 92 (Md. 1967); *Spicer v. Balt. Gas & Elec. Co.*, 831 A.2d 472, 280-81 (Md. Ct. Spec. App. 2003). Mr. Smith has not argued that he lacked the necessary capacity, but he has submitted documentation of his neuropsychological condition,[6] so it would seem appropriate to address the matter in brief.

---

*Swift v. Frontier Airlines, Inc.*, 636 F. App'x 153, 156 (4th Cir. 2016) (per curiam). Here, Mr. Smith has never placed the agreement's existence or terms into dispute. In all of his filings in this case, the only time he explicitly referenced the settlement agreement was in response to the Court's request for supplemental briefing on whether his assent was knowing and voluntary, and there he simply declared, without elaboration, that the agreement was "false," was not signed, and "was not knowingly and voluntary[il]y made." Pl.'s Suppl. 2, ECF No. 50. These bare assertions do not create a "substantial factual dispute" and do not warrant a hearing.

[6] One of Mr. Smith's filings on this subject contains a handwritten note in which he requests a court-appointed attorney. *See* ECF No. 38-1. There is, of course, no absolute right to counsel in civil litigation. *See Anderson v. Warden*, No. PWG-14-216, 2014 WL 2916882, at *1 n.1 (D. Md.

7

"The law presumes that every man is sane and has capacity to make a valid [contract], and the burden of proving the contrary rests upon those who allege that he lacked mental capacity." *Zook v. Pesce*, 91 A.3d 1114, 1122 (Md. 2014) (quoting *Arbogast v. MacMillan*, 158 A.2d 97, 101 (Md. 1960)). A contract is considered voidable if a party, "by reason of mental illness or defect," is "unable to understand in a reasonable manner the nature and consequences of the transaction" or is "unable to act in a reasonable manner in relation to the transaction and the other party has reason to know of his condition." Restatement (Second) of Contracts § 15(1) (Am. Law Inst. 1981). Generally, to establish that the requisite mental capacity was lacking, the plaintiff "must provide proof of irrational or unintelligent behavior. It is not enough to show that there was an intellectual weakness which did not amount to a lack of power to comprehend." *Marston v. United States*, No. 10-10437-GAO, 2012 WL 4529940, at * (D. Mass. Sept. 30, 2012) (citation omitted); *see Cain v. Warford*, 33 Md. 23 (1870) (holding that a clear demonstration that a party to a contract was "weak and feeble in mind" did not, in and of itself, render the contract void absent "any proof of fraud or deception practiced upon him in consequence of his weak mind").

Here, Mr. Smith has submitted evidence that, as a generally matter, his cognitive faculties are limited. *See* 2015 Neuropsychological Evaluation, ECF No. 29-1; 2018 Diagnostic Evaluation Summ., ECF No. 38. Mr. Smith holds a high school degree and has completed some coursework at Montgomery Community College. 2015 Neuropsychological Evaluation 1. However, a September 2018 medical evaluation reported his full-scale IQ placed him in the "[b]orderline range

---

June 25, 2014). "[T]he power to appoint counsel is a discretionary one," generally granted upon a showing of "exceptional circumstances." *Hopkins v. MTA Bus*, No. PWG-13-1496, 2014 WL 4662525, at *7 (D. Md. Sept. 17, 2014). Mr. Smith had the benefit of counsel until a breakdown in the attorney-client relationship prompted his attorney to withdraw from the case. *See* ECF No. 20. While I fully recognize that proceeding *pro se* is likely to present challenges for any litigant – particularly one who is seeking to enforce rights under the ADA for cognitive impairments – I decline to exercise my discretion under the circumstances.

of overall intellectual functioning." 2018 Diangostic Evaluation Summ. 4. The psychologist who completed the report – the accuracy of which, incidentally, Mr. Smith contests[7] – concluded Mr. Smith "processes information slowly and responds to stimuli in a very inefficient manner. As a result, he also will require extended time to complete tasks."[8] *Id.* at 8.

Mr. Smith's supplemental brief, filed in response to an order of this Court, asserts, in conclusory fashion, that the settlement agreement "was not knowingly and voluntary[il]y made." Pl.'s Suppl. 2, ECF No. 50. Mr. Smith, though, has never argued that he could not understand the nature and consequences of the settlement agreement as his lawyer presented it to him and, critically, he has made no attempt to meet his burden of proof on this issue. *See Tirado v. Waterbury Housing Auth.*, No. 14-1153-JCH, 2015 WL 9943620, at *3 (D. Conn. Dec. 8, 2015). The County, by contrast, has loaded the record with evidence that Mr. Pitre, the attorney who represented Mr. Smith at the time of the settlement talks, was firmly convinced that his client had, indeed, assented to the agreement. *See* Signature Emails 1; Pitre Aff. ¶¶ 8, 10. Mr. Pitre's affidavit affirms that he "spoke with Mr. Smith about what, specifically, he was looking for" in a settlement; "explained to Mr. Smith exactly what a settlement would mean for his case"; and elucidated "the pros and cons of settlement." *Id.* ¶¶ 5, 7. The affidavit further states that Mr. Pitre accorded Mr. Smith "time and an opportunity to sign" the agreement, and that Mr. Smith "kept telling [him] he would get it signed but never did." *Id.* ¶¶ 10, 12.

While I have taken pains to address the question of Mr. Smith's mental capacity, out of an abundance of caution, the onus of placing the issue into dispute was on Mr. Smith, and he has not

---

[7] Although Mr. Smith himself filed the report with this Court, he enclosed along with it a handwritten letter stating: "I do not agree with the report that was written and will be retested . . . ." ECF No. 38-1.

[8] Mr. Smith filed this document under seal. I quote from it sparingly here for purposes of resolving the County's motion.

done so. Confining myself, accordingly, to the record before me, I am satisfied that Mr. Smith has not rebutted the presumption that he could reasonably understand the nature and consequences of the settlement agreement and that he therefore, as a legal matter, had the capacity to enter into the agreement. Further, because the operative facts underlying the enforcement of the settlement agreement all occurred when Mr. Smith was represented by counsel, and for the reasons already stated, there is no evidence that Mr. Smith is incompetent, and so it is not necessary to appoint a guardian ad litem on his behalf. *See* Fed. R. Civ. P. 17(c)(2).

2.

The next question is whether the parties did, in fact, reach a complete agreement. *See Hensley*, 277 F.3d at 540. The County has submitted ample evidence that they did.

To be sure, Mr. Smith never signed a written agreement. Under Maryland law, though, "a signature is not required in order to bring a contract into existence, nor is a signature always necessary to the execution of a written contract." *Porter v. Gen. Boiler Casing Co.*, 396 A.2d 1090, 1095 (Md. 1979); see *See Copeland v. Dapkute*, No. 17-1566, 2018 WL 5619672, at *5 n.6 (D. Md. Oct. 30, 2018). The function of a signature is purely evidentiary, serving only to demonstrate the signor's assent to the agreement. *See id.* A party's conduct, or even silence, may, as well, suffice as evidence that an agreement existed and that the party intended to be bound by it. *See id.*

Here, the record shows that counsel for both parties hashed out an agreement that required the County to make two key concessions in exchange for a waiver of Mr. Smith's legal claims. First, the County would agree to pay $5,000. The Assistant County Attorney relayed this offer to Mr. Pitre on April 23, 2018, *see* Settlement Negotiation Emails 8, and Mr. Pitre confirmed the

following day that he had discussed the offer with Mr. Smith "and he will accept the terms," *id.* at 7.

A second – and, according to Mr. Nunley, "separate" – part of the agreement required the County to concede to Mr. Smith's requests for accommodations. *Id.* at 9. As of April 24, 2018, Mr. Pitre indicated that the only accommodation request on which the parties had yet to agree was Mr. Smith's wish for training to operate equipment other than trucks. *See id.* at 7-8. Mr. Nunley confirmed on April 27, 2018, that the Department "can provide the training on the pieces of equipment listed by Mr. Smith." *Id.* at 5. To this, Mr. Pitre replied: "That is wonderful news! Looks like we'll have this wrapped up shortly." *Id.* at 4.

As the weeks passed, with the attorneys still waiting for Mr. Smith to sign the final written agreement, Mr. Pitre confirmed to opposing counsel that the parties had "indeed reached an agreement." Signature Emails 6. Mr. Pitre's affidavit avers that, after receiving the written agreement, "Mr. Smith kept telling me he would get it signed but never did. He never stated he would not sign the agreement." Pitre Aff. ¶ 10. Ultimately, Mr. Pitre decided to withdraw as counsel because he "felt [he] could not continue forward with the case based upon the fact that [they] had settled." *Id.* ¶ 12.

Mr. Smith had three months to file a response in opposition to the County's motion to enforce the settlement agreement. I also accorded him an opportunity to provide supplemental briefing in connection with the motion. To date, his only statements on the issue are: the agreement was a "false settlement agreement" that "was not signed by the plaintiff"; the agreement "cannot be considered concluded and may not be considered enforced"; and, echoing the language of the Court's order for supplemental briefing, the agreement "was not knowingly and voluntary[il]y

made." Pl.'s Suppl. 2. He has not put forward any facts to refute the conclusion, evident from the record, that a complete settlement agreement existed and that he had assented to it.

3.

The final question that must be answered before ruling on the County's motion is whether Mr. Smith's assent was knowing and voluntary. This issue – similar, in some ways, to the preceding discussion of mental capacity – is essential here, because a court cannot enforce a waiver of rights under the ADA or other federal laws prohibiting employment discrimination without first assuring itself that the party waived his rights knowingly and voluntarily. *Bledsoe v. Palm Beach Cty. Soil & Water Conservation Dist.*, 133 F.3d 816, 819 (11th Cir. 1998); *see also Alexander v. Gardner-Denver Co.*, 415 U.S. 36, 52 n.15 (1974) (discussing waivers under Title VII of the Civil Rights Act of 1964); *Kendall v. City of Chesapeake, Va.*, 174 F.3d 437, 442 n.2 (4th Cir. 1999); *Lewis v. Extended Stay Am., Inc.*, 454 F. Supp. 2d 453, 457 (M.D.N.C. 2006).

In Title VII cases, courts review a waiver's validity "under a 'totality of the circumstances' standard." *Cassiday v. Grenhorne & O'Mara, Inc.*, 220 F. Supp. 2d 488, 493 (D. Md. 2002), *aff'd*, 63 F. App'x 169 (4th Cir. 2003). Under this standard, which applies as well in ADA cases, the court may consider such factors as:

> (1) the employee's education and business experience; (2) the respective roles of the employer and employee in determining the terms and conditions of the waiver; (3) the clarity of the agreement; (4) the time the employee had to study the agreement; (5) whether the employee had the advice of counsel; (6) whether the employer encouraged the employee to seek the advice of counsel and whether the employee had sufficient time to do so; and (7) the waiver's consideration.

*Id.* (citing *Melanson v. Browning-Ferris Indus., Inc.*, 281 F.3d 272, 276 n.4 (1st Cir. 2002)). This list is non-exhaustive. *Id.*

Here, the record shows that Mr. Smith holds a high school diploma and has taken some college courses. 2015 Neuropsychological Evaluation 1. To be sure, his suit alleges that he faces significant cognitive challenges, and he has submitted psychological evaluations that support this assertion. *See id.*; 2018 Diangostic Evaluation Summ. It is incontestable, though, that he was represented by counsel throughout the settlement negotiations. His lawyer at the time, Mr. Pitre, has attested that while representing Mr. Smith, he explained "exactly what a settlement would mean for his case" and "the pros and cons of settlement." Pitre Aff. ¶ 5. During the talks, he said, he "spoke with Mr. Smith about what, specifically, he was looking for and conveyed Mr. Smith's demands to the County Attorney." *Id.* ¶ 7. When, at last, an agreement had been finalized and committed to writing, Mr. Smith repeatedly told his attorney he would sign it. *See id.* ¶ 10. Mr. Pitre accorded him "time and an opportunity" to sign the document, only to conclude that he had to withdraw as counsel because it was apparent to him that the case had, indeed, been settled. *See id.* ¶ 12.

In response to my order for supplemental briefing on this issue, Mr. Smith stated only that "this agreement was not knowingly and voluntar[il]y made." Pl. Suppl. 2. Once again, he has not put forward any arguments or assertions to undermine what the County has made clear. I find, accordingly, that the agreement was knowing and voluntary. The County's motion to enforce the agreement is therefore granted.

**Motion to Seal**

I turn, finally, to the County's motion to seal. The motion is broad, to say the least. It asks the Court to seal the following filings: the motion to enforce the settlement agreement, including all exhibits; Mr. Smith's responsive filings; and all court orders addressing the motion. *See* Mot. to Seal, ECF No. 27. The County provides two justifications for its request. First, it argues the

motion to enforce the settlement agreement "contains confidential settlement communications, and therefore, should be placed under seal." *Id.* Second, it notes that certain filings contain psychological evaluations relating to Mr. Smith's disabilities, which Mr. Smith "most likely would not want disseminated to the public." *Id.*

A motion to place court documents under seal pits the parties' privacy interests against the public's right to an open judicial system. *See Doe v. Pub. Citizen*, 749 F.3d 246, 265 (4th Cir. 2014). While both the common law and the First Amendment guarantee a "qualified right of access to judicial documents and records," *id.*, there are circumstances in which a court may place certain records under seal, *see, e.g., Pittston Co. v. United States*, 368 F.3d 385, 406 (4th Cir. 2004) (affirming the denial of a motion to unseal documents containing "confidential, proprietary, commercial, or financial data" (internal quotation marks omitted)). Local Rule 105.11 recognizes the court's authority to seal records upon a motion, provided the motion supplies a fact-based justification for the sealing and explains "why alternatives to sealing would not provide sufficient protection." Loc. R. 105.11.

A party's interest in keeping the terms of a settlement agreement private will not ordinarily outweigh the public's interest in access to judicial records. *See Herrnreiter v. Chi. Housing Auth.*, 281 F.3d 634, 636-37 (7th Cir. 2002); *Brown v. Advantage Eng'g, Inc.*, 960 F.2d 1013, 1015-16 (11th Cir. 1992); *Fonseka v. AlfredHouse ElderCare, Inc.*, No. GJH-14-3498, 2015 WL 3457224, at *2 (D. Md. May 28, 2015). Here, it is true that the County enclosed purportedly confidential settlement communications as part of its motion, but the County placed those communications into contention when it moved to enforce the agreement. I have relied on the records of those communications in my ruling here, and just as the public has a right to inspect the rulings this Court issues, it has a right to inspect the documents that inform my judgment. *See Herrnreiter*,

281 F.3d at 637 ("Now that the agreement itself has become a subject of litigation, it must be opened to the public just like other information . . . that becomes the subject of litigation.").

The County's second justification is stronger. *See Rock v. McHugh*, 819 F. Supp. 2d 456, 475-76 (D. Md. 2011) (stating that "sensitive medical" information may be sealed). Plainly, though, its request to seal all filings in connection with the enforcement motion is overbroad. *See id.* In my view, the only filings in the record that may properly remain sealed are the two psychological evaluations (ECF Nos. 29-1 and 38) and the EEOC documents enclosed as Exhibit 12 to the County's motion to enforce the agreement (ECF No. 25-24). These filings will be sealed. The rest will not.

## CONCLUSION

The record here shows that Mr. Smith knowingly and voluntarily entered into an agreement to settle this case. His refusal to sign the agreement, once it was committed to writing, does not render it unenforceable. The County's motion to enforce the settlement agreement is granted. Its accompanying motion to seal certain filings is granted in part and denied in part.

A separate order will follow.

Date: March 11, 2019

Paul W. Grimm
United States District Judge